Mr. Heisenberg? May it please the Court, Ronald Heisenberg for the Commonwealth. May I reserve five minutes for rebuttal, Your Honor? The defendant was convicted of murdering Shadell Williams for her hearings 24 years ago. The conviction was vacated by the District Court granting Edpa Brady relief on three different grounds. I'd like to start with the alleged alibi evidence concerning Latanya Kaysen, who in fact is not an alibi at all. Now, the essential fact in judging the materiality of this evidence is that the Kaysen alibi depends entirely not on Kaysen seeing the defendant, but on her seeing him on a bus. And the reason for that is because there was no dispute here about where the defendant went after the shooting. He went to the Abbotsford Homes. The evidence was clear that that's where he had lived much of his life, where most of his friends lived, where he spent most of every single day. The Commonwealth's evidence showed that he got into a deadweight car after the shooting and tore off and could easily have been at the Abbotsford Homes within 13 minutes of the shooting. So the question of how he got there is the essential thing, not that he was where, not that he was there. And the problem with the Kaysen alibi evidence is that Kaysen didn't say she saw him on the bus. In fact, the new affidavit presented by the Defense on Post-Conviction Proceedings from Kaysen specifically says that she saw him at the Abbotsford Homes, not on the bus. And in fact, as she specified, she got off the bus at Henry and Midvale, which is at least one half mile away from the Abbotsford Homes, from the closest point of the Abbotsford Homes to the bus stop. So regardless of the time that she did that, she couldn't have seen the defendant on the bus. And without that, there's no alibi and no materiality and no Brady violation. Now, the truth is that the bus claim, which was the essence of this alibi, was weak to the point of vanishing, even aside from LaTanya Kaysen. The bus claim from its inception was incredible. It depended on the statement of the defendant's father that he was with the defendant and they left his, the father's house at exactly 153. He specified 153 to go out and catch the bus. And that he then saw the defendant get on the bus right at that moment while he was sitting there in his car. He went out and sat in his car and watched his 20-year-old son until he got on the bus. Now, 153 happened to be almost the exact moment of the murder. And the precision was important because the father, unlike the defendant and the defendant's mother, lived rather close to the site of the murder at Fern Rock Transportation Center, less than a mile away. So minutes mattered in terms of trying to locate the defendant at a different place than the murder. Aside from the incredibility of the defendant's father remembering the exact moment that he did this on a day when, according to him, nothing special happened at all, there's the fact that the defendant's own statement to the police claimed that he actually left his father's apartment not at 153, but at 130 that afternoon. And when questioned about this at trial, all he could say was, well, you heard my father say that it was 153. There was also the fact that evidence was presented at trial from a SEPTA employee that showed that, in fact, the bus wouldn't have passed by the father's house at 153. The father claimed that he knew when the bus comes because he takes the bus regularly and he knew the schedule. He never explained how that is if he has a car, nor did he explain why he didn't just drive the defendant where he was going. Actually, he did explain that. He said, I had to go somewhere. He was asked where he had to go on that day that he, on which nothing special happened, but he remembered in detail. And his answer was, I don't remember where I had to go, but I had to go somewhere so my son took the bus. The SEPTA employee testified that the schedule showed that the bus would not have arrived at that stop yet, that there were several stops before that had a 156 stop. So that at 153, the bus wouldn't have even been several stops in advance on the other side of Broad Street. And the additional problem with the bus alibi is that when asked about the bus alibi and his claim that he had seen Kaysen on the bus, the defendant said, oh no, I said I only thought I saw her on the bus. Now, there's a subtle point there that I think has been eclipsed by the defense. He didn't say, oh, now I realize that. I understand the factual argument you're making. Let me ask this. Should we not interpret the Dennis one, that maybe it's actually four, that the police did have in their possession the DPW receipt showing when the time that Kaysen picked up her check? Yes, sir. I'll be happy to address the suppression claim. Obviously, of course, if there's no materiality in light of the facts that I've discussed, then the suppression claim would be of no avail. It was actually 103, and she initially thought she picked it up at 303 because she misread the receipt. And then the question is, who had possession of the receipt? Then I guess you go on later on. Could the defense have somehow, through due diligence, gotten a hold of the same receipt that was being held by the prosecution? There's a second question, but hit mine first. So I'd like to address exactly that question. Did the Commonwealth have the receipt? And the answer is that the existing record shows that it didn't have the receipt. That it did not? That it did not. What do you mean by the Commonwealth? I mean in the broadest sense. And let me explain, Your Honor. Prosecution and law enforcement. That's correct, Your Honor. But we're not going back to look at the record. We need to defer to the fact-finding of the state courts. And we have a statement here in the recitation of facts that says, during their investigation, however, the police came into possession of the DPW receipt showing that case in Kastrichek at 1.03 p.m. Don't we have to defer to that finding, at least as it appears to be? No, Your Honor. Given its placement? One thing, there were actually two statements about this issue in the state Supreme Court opinion. And as the panel recognized, that at the very least creates some ambiguity about what that factual finding was. The later statement is, there is no evidence that the Commonwealth withheld the receipt from the defense. Now, I understand that withholding and possessing are different things. But we have to look at this opinion against the factual background in the record in order to decide what was within the realm of reason. Well, because that's what deference requires. And that's why I'd like to discuss the facts about the receipt. Isn't part of what's in the record also the Commonwealth's inaccurate assertion to the Pennsylvania Supreme Court that the receipt was introduced as an exhibit at trial? What do you make of that? Your Honor, I think here's the confusion. There was one pink document. This receipt was referred to as being pink. But there was one pink document. It was introduced at trial as an exhibit. And it wasn't the receipt. It was a different pink document called the Scheduling of Welfare Payments, which was distributed to people so they would know what day they could come and pick it up. But that only showed the day. That didn't have a time stamp. That's exactly right, Your Honor. And therefore was of no significance to the defense. But that's the document that the Commonwealth had. But Kaysen said that she gave her receipt to an investigating detective. So it wasn't possession of the law enforcement. That's her later claim, Your Honor. But she doesn't account for all the facts of the record. In other words, Kaysen doesn't say, there were two pink things. I gave them the card. And then later on, or at the same time, I gave them the receipt. She says I gave them one thing. We say she gave us one thing. There's no actual... I'm not getting a lawsuit because the Schedule of Receipts that we just agreed, that shows the dates that one's checks are available to be picked up. Yes, Your Honor. Not the time that the State Supreme Court in Dennis Waterworth specifically said what Judge Carls just cast to you, a DPW receipt showing that Kaysen cashed her check at 1 to 3 p.m. That can't be the Schedule of Payments. Yes, Your Honor. And apparently, the court was confused. But at the very least, we know that the court specifically then said, at the end of that very discussion, something which seems contradictory, which is there is no evidence that the Commonwealth withheld the receipt. Now... Well, that's only contradictory if we assume that Carls did not create an obligation on the part of the prosecutor to find out whether the police had an impact. Yes. Well, let's look at this in terms of Carls coming in in 1995, I guess it was. And at the time in Pennsylvania, there was not an obligation. The Brady obligation only applied to police... I'm sorry, to DA's files, prosecutors' files, not within the police files. If we look at it through that lens, then it's very clear what happened here, that there was not a withholding because the receipt mentioned initially, the 103 receipt, was in the police files. I think you referred to them one time in the prosecution files, not in the DA files. Therefore, there's no obligation under Brady. Therefore, the Commonwealth did not hold the receipt for the defense. There's no evidence of that, which is very different from saying that the receipt showing the 103 paycheck was in the position of the public welfare. That's totally consistent. Yes, Judge McKay, I understand the argument. The defendant is essentially asking you to do exactly the opposite of what the statute requires. But don't we... You're arguing here a little bit about the fact that there was no receipt. Well, the question that the district court got to was that there was a Brady violation for the failure to provide the receipt to the defendant. So that's what we really have before us. And that's why I began with the materiality point. Your factual background is helpful, but it doesn't go to the heart of the matter. The heart of the matter is materiality, as I've tried to address, Your Honor. Don't we have to look here? And I think the important question for this court at this stage on the case and receipt question is what argument could have supported the decision by the Pennsylvania Supreme Court? Yes, Your Honor. And when you look at... Is that the issue? Do you agree with that? Do you? Of course, Your Honor. The victor applies to the situation. Well, I want you to, whether it be your answer to Judge McKee's question or my question, tell us how you think Richter controls this gap-filling analysis. Well, first of all, on the materiality question, we don't really even have that legal question because the state Supreme Court did hold that the receipt was not material, even if it had been suppressed, because the times didn't match. And that's essentially the argument that I've been making to you, that the times don't line up right. Not just that the times don't line up right, but that given the importance of the bus, the receipt is not material. You have to defer to that finding. Then there's the additional question of suppression. And in answer to your legal question about Richter, I think it's quite clear that the court has to not its reasoning. And remember that Richter wasn't the only case that was decided on that very day. There was also the case of Primo v. Moore, also written by Justice Kennedy, on the very same day. It seems to me, and this lines up, my question lines up with those two cases, but I'm not sure that so far you've touched on or even responded to what I thought was the import of Judge Fisher's question. And that goes to gap filling and even whether or not there was a gap here, pursuant to the two cases, the names of which we've just mentioned. I mean, was there a gap? If so, what was it? No gap on materiality. I would say no gap even on suppression, because given the record, which showed that there was one document, the defendant's offer of proof, or at least the defendant's affidavit simply doesn't explain the way that it says. Because if there's no gap here, then the panel had no authority to attempt to fill such a gap and to reach the question of due diligence, right? I wouldn't agree with that exactly, Your Honor.  To the extent that the court, the state court, gave a reasonable or could have did provide a reasonable basis for this decision, that, of course, must be deferred to. To the extent that the state court didn't articulate reasons, the federal court under ADPA must consider what the state court could have done. And that's Richter, because Richter was just a summary of evidence. That's why I mentioned Primo, Your Honor. In the Primo case, there was an opinion. There was an opinion that was so vague as whether it was form one or form two of Strickland that insofar as whether it was one or two of Strickland, there really wasn't an opinion. You couldn't tell. And so the court said you've got to assume some kind of – you've got to go in there and try to gap fill. To me, it's the thing of you presume a reasonable decision, the same thing we do with decisions of Congress. So if there's no explanation or an explanation which is so ambiguous, as in Primo, that you can't figure out what they did, it's incumbent upon us to assume they acted reasonably and resupply the reason. But what about AFRA? AFRA is a situation where there was a pretty firm – there was no gap. There was an explanation as to why the defendants pled guilty, saying that it rejected the paper and went to trial. And the state court made out a pretty thorough rationale, which later on the Sixth Circuit said, and the Supreme Court agreed, did not require the kind of Richter or Primo gap fill that you're arguing should apply here. Help me understand why AFRA wouldn't undermine your view of Richter and Primo. First of all, Your Honor, I respectfully disagree that Primo held that there was essentially no opinion. No, I agree. I didn't mean to say that. They said the court didn't supply reasons in this particular area. We must hypothesize what those reasons could have been. If there were any reasonable bases, we must follow them. Even if we were thinking of themselves, the telltale words, Your Honor, are words like could have and would have. The state court could have or the state court would have if it had addressed this. Those kinds of words appear in six different places in the Primo argument, in the Primo opinion, Your Honor. Six different times that the court essentially, as I think you would characterize it, filled the gap. In the Collins case from this court from last year, the same thing happened. And there again we had an opinion from the state court which this court described as cursory. It wasn't a sufficiently full explanation of the court's conclusions. This court did exactly the same thing. It said that we must still review the arguments that could have supported that court's holding. Does that happen even when they've given a reason? In other words, and I may just be repeating the Chief Judge here, but doesn't there have to be some ambiguity? I mean, there's got to be something you could reasonably call a gap, isn't there? I mean, if they give an explanation, it's the only explanation, and it covers the territory, then by definition there's no gap to fill, is there? Arguably, Your Honor, I think that's a harder case, but it's not this case. Because where's the gap? Well, if the court doesn't believe that the state court ruled that this evidence was not material, or if this court doesn't believe that the state court articulated sufficient reasons as to why it was or was not material, this court must examine arguments that could have supported the court's holding. Is that true even if they articulate the wrong reason? Does that go that far? Even if it's the wrong reason. I think that was Judge Jordan's question, Your Honor, as well, if I understood it, and my answer is I think that's a harder question, which is still open from the U.S. Supreme Court, but it's not this case. That was the wrong reason. They studied the rule, they studied the case, but then they applied the wrong rule to the case they studied. They didn't address the Richter question, Your Honor. You have to look at the rationale of the Richter case. So what's the rule then? Is the rule then if it's an incorrect application, no gap filling, but if it's ambiguous, there can be gap filling? Well, I think that the answer to your first question is that it's not before the court and therefore can't be decided here. And the answer to your second question is yes. If there's something that this court thinks of or can see as a reasonable basis for the state court's ruling that the state court didn't articulate, this court has to consider that argument. Does that argument have to have been made in the state court? No, Your Honor. Presumably. We can't just pull something out of the air and say, oh, well, we see something that nobody else talked about. Your Honor, the Edpa statute is not a grading of papers either of the state court or of the parties before the state court. Well, it really is. It is a grading of papers with deference of what the state court did and what was before the state court. Because the courts have said precisely that the deference eliminates the grading of papers concept. In other words, you're not going through to say they did a good job here, they did a bad job here. All the more so, the federal court isn't doing that as to the parties and what they argued in state court. Can you please tell us what the gap is? I'm going to go back to Justice Ginsburg. We're all digging for that gap. We're all looking for the gap. I don't think on the case point that there's a gap as to materiality. There's an ambiguity as to the suppression claim. Mr. Eisenberg, let me direct you in that direction here. It's not a soft point. Get me through this. It's not a soft point. You obviously read the panel opinion in this case, and we didn't deal with the materiality issue. Now, let's just assume for a second that the court could disagree with you on the materiality issue, which takes us to the withholding question. Now, on the question of withholding, the Pennsylvania Supreme Court's entire explanation is this. Let me read this to you. Finally, it's clear that there clearly was no Brady violation. The DPW receipt was not exculpatory because it had no bearing on the appellant's alibi, and there's no evidence that Commonwealth withheld the receipt from the defense. Yes, Your Honor. In other words, the court out. If that's all that the Supreme Court said about withholding, it seems to me there's a gap, because I've been reading that for a number of months. It might be a year now. I can't find the reasoning. The Supreme Court addressed in that conclusion both elements of the Brady claim, materiality and suppression. The cursory statement of the Supreme Court in that regard was essentially identical to the, quote-unquote, cursory statement of explanation that this court would use in the college case. So does the statement by the Supreme Court, does that sentence that Judge Fischer read you, give rise to a gap? Arguably, as to the second point on suppression, Your Honor. On withholding. It's just a word that's important. Let me back up a second. If by gap, and I may have been misunderstanding that, we mean not just a holding by the court, but a lengthy explanation of reasoning, well, then there might be a gap on both of those points. But that's precisely the kind of gap, the reasoning, the additional reasoning that it could support the state court's conclusion that Richter and Primo and Collins clearly require this court to provide. That's assuming the statement there is no evidence that is a legal conclusion and not a finding of fact. If it's a finding of fact, and it weren't for the previous statement, then it would be even harder for the defendant because we'd have a finding of fact that the state, that this court must defer to. But if we have a recitation of an erroneous finding of fact, then we're not in the land of epideference anymore, then we're looking at it de novo. How does one make, how does one draw a finding of fact from the nonexistence of evidence? One might draw a conclusion, a legal conclusion from that, but how does one engage in factual determinations where there is no evidence from which to make such a factual determination? It's a statement of fact about the record before the court, Your Honor. And it really, it doesn't matter that much whether we really labor to characterize that statement as one of fact or law because either way it would require deference from this court. But we have a situation where the Commonwealth had misrepresented to the state Supreme Court that this receipt, not the payment schedule, but the receipt itself had been turned over at trial, which is perfectly consistent with the findings of fact that it came into possession of the prosecutor and that there's no evidence that it was withheld because it was put into trial, into evidence at trial as the Commonwealth represented inaccurately to the state Supreme Court. As you said, Your Honor, inaccurately. If such a representation was made, it was contrary to the record. The card was exhibited at trial. It is in the record that this court has. It says schedule of check payment dates and food stamp authorization.  It doesn't look like the receipt. It's clearly not the receipt. The police activity sheet that was made, recorded at the time of the initial interview with Kasin, records that she gave them the scheduling of check payment card. There's nothing about the receipt. Was there a representation made that all of the pertinent braiding material was turned over? I assume that that's pretty common. I assume such a representation was made at trial. I don't know whether such a representation was made here. But, of course, the question is what is braiding material? And what we've been discussing is what is a braiding material. That's your question. My question is what is that representation made? I do not know, Your Honor. I'm sorry. Could you at this point discuss the Frazier lead material, which I have a concern about? The court, I understand, found that it was because it was inadmissible, therefore not braiding material? Yes, Your Honor, but not, I think, in the way that's been characterized by the defense. The argument has been made that the state court held unreasonably that the initial pieces of evidence, the bare statement that we have from Frazier, had to be admissible in and of itself. And that's just not true. And we know that wasn't the state court's thinking. So we can, therefore, conclude that the material does not have to be admissible to be braiding material. The first piece of material doesn't have to be admissible, but the last one does. It has to lead to admissible evidence. And that's exactly what the state court said on the very next page after the Frazier discussion when it was addressing Zahra Howard and distinguished between those two cases and remanded for an additional hearing on the Zahra Howard question because the court stated in regard to Zahra that the Commonwealth asserts that the information is double hearsay. This is in the appendix of A74 and 75. It is admissible as such and thus immaterial under braiding. The Pennsylvania Supreme Court rejected that argument. And it said the report would have led trial counsel down new investigative avenues that had the potential to materially undermine the Commonwealth's case. And it said further that as to Howard, the appellant had expressed and couched the utility of this evidence and its value as impeachment of one of the Commonwealth's key witnesses and thus resists the claim of inadmissibility. In other words, because the evidence could have led to impeachment material against Zahra Howard, the court said it could qualify as braided material. And on the remand, when given the opportunity to prove that Zahra Howard had actually made a prior inconsistent statement, the defendant failed, did not even attempt to do so, and the evidence showed that in fact she had not and there was a fact-finding. But let me return to the Frazier. So why wouldn't the Frazier material get in here? The light is on. And it did answer the question. Thank you. You served some time, too. Yes, Your Honor. Thank you. Good morning, Your Honor. Good morning, Your Honors. Amy Rowe for Appley. James Dennis. Your Honors, this case presents exactly the kind of extreme malfunction that habeas was designed to address. And that is what Judge Brody found. And the Commonwealth has come in and asked you to reverse all of Judge Brody's findings and let that extreme malfunction stand. And it asks you to do so not just to rubber stamp the state court's decision, but to actually cure errors in those decisions by seeing if there's some reasonable basis that they could have come up with for those unreasonable decisions. The Supreme Court has never done that with a reasoned opinion, and rightly so. It would render habeas review not just limited but virtually meaningless. And meaningless habeas review is vital in a case where the jury never heard about extensive exculpatory evidence. And it's critical here to contrast the trial that Mr. Dennis had with the trial that he didn't have because of the suppressed evidence. It's true that there were three eyewitnesses in this case. Three out of nine that police interviewed in court. But those identifications were challenged. And Mr. Dennis asked the jury to say, please believe those identifications were mistaken. I don't match the descriptions, and I have an alibi. And that alibi was I was on the bus. I was on my way to Abbotsford. And when I was on that bus, I saw a neighbor, Latonya Kaysen. I don't know if she saw me, but when we got off at the bus stop, we waved to each other. So they went to Latonya Kaysen, and she said, I did take a bus that day. I did take the K bus to Abbotsford. I did see him when we got off at the bus stop, and I do remember waving to him. But it couldn't have been the time that he said because I worked until 2 that day. And that was the end of Mr. Dennis' alibi. He had nothing to challenge her recollection. She had no reason to lie. The time came down to her word against his, and he was branded a liar. And at that point, there was no reason for the jury to doubt those identifications. But imagine the trial where the jury got to hear the suppressed evidence. Think about how drastically the receipt alone changes things. That one piece of paper shows that Mr. Dennis was telling the truth. He was where he said he was, when he said he was. Literally, the only thing that made Kaysen a Commonwealth witness instead of a defense witness was her recollection of the time, and the receipt changes that completely. She wasn't working until 2 o'clock. And now Kaysen isn't making him out to be a liar. She's confirming his story. Now the jury has a good reason to doubt those identifications. Now add to that the fact that the police had information that someone else committed the crime. But they abandoned the lead, even when key parts of it checked out. They found one of the suspects, Ricky Walker, who William Frazier told them about, exactly where Frazier said he would be. And just like Frazier said, he admitted that he knew the victim. A huge red flag right there. So Walker, not surprisingly, didn't admit committing the murder. But they accepted that. Just like in Kyle's, they accepted it. They didn't even check out his alibi. They then had information from Frazier about a pawn shop. It was exactly where Frazier said it would be. They didn't even go inside to look for the stolen earrings. They had the name of Angela Frazier, another witness who could corroborate this confession. And they didn't even call her. They had three addresses and a phone number for the mythical Tony Brown the government talks about. And they never went to any of them before they dropped this investigation. Now add to that the fact that these same detectives in their files had to know that Zara Howard, one of their key witnesses, going around telling people that she recognizes the victim from high school, a high school that Ricky Walker admits he knew her from and Mr. Dennis did not go to. The shooter? You said the victim. I'm sorry to interrupt you, but you recognize the victim you said? The perpetrator. Right. From high school. And it's a school that Mr. Dennis didn't go to and Mr. Walker admits that's where I knew her from. And that's exactly the kind of shoddy police investigation that the Supreme Court found material in Kyle's. And yet in the face of all this information that was kept from the jury, the state court found that it wasn't probable that even one juror's mind could have been changed. That holding was objectively unreasonable. And failing to consider it cumulatively was contrary to Kyle's. In sum, Your Honors, Judge Brody properly found that these holdings were unreasonable and unconstitutional under Ed Huff. And she then properly found that the suppressed evidence could well have prevented Mr. Dennis' conviction for a crime that, quote, in all probability he did not commit. I welcome your questions. Was any of the Frazier information you alluded to, would it have been admissible? Yes. And it was argued also before the state court that it would have been admissible to question the police officers in exactly the way it would have been in Kyle's. How only to question the police officers? Well, it's hard to tell ten years later how much investigation could have come out of that. Ten years later, which is when the material was turned over. But it absolutely, at a minimum, could have been used to question the police officers. Is admissibility a standard for turning over braiding material? Pardon me? Is admissibility a proper standard for turning over braiding material? No, it's certainly not what the state court did, which is a separate inquiry from exculpatory and material. Is it absolutely appropriate to consider whether, as part of materiality, there's any way to get this information in front of the jury? So in that sense, if you look at Wood, if it's not admissible and there's no way, the attorney in Wood actually said this wouldn't have even affected my cross-examination. Didn't Frazier say that everything he had said previously was to use his word bullshit? You mean during the appellate process? Yes. And he said that in the context of a letter to the Commonwealth that said, I appreciate your offer of helping me however you can. So I don't think we should afford that much weight. But there's a jury argument, and the question is probably more materiality than admissibility, because it can be quite material but not admissible. Absolutely. The information itself could have been used at trial. You could have gotten that information from the jury in a way that Kiles lays out for us fairly clearly. Keep in mind, in Kiles, the information where they talk about that shoddy police investigation, that was not material that was admissible in itself. In Kiles, you had a witness, Beeney, who didn't even testify at either trial. And the Supreme Court actually said even if the defense hadn't called Beeney and even if we hadn't called Frazier here, then you could have asked the police officers, you know, how did you abandon the state? How did you accept his word uncritically that he didn't commit this crime? How did you just let this investigation go? And in some ways, this is an even stronger case than Kiles, because there's a lot more evidence that ties to the actual crime. And so in that way, even if the Supreme Court, state Supreme Court, was correct that it was important to consider admissibility in some way, it certainly wasn't a said requirement, and it certainly wasn't something that was relevant here where we did show that it was admissible. Can you please speak? You said in your opening statement and in your briefing, of course, too, that Richter is limited to state court decisions which are without a reasoned opinion. Can you tell us where you find that limitation in Richter? Richter specifically says, are we talking about the ellipses issue? So Richter says, whereas here, we have no decision to go from, essentially, where there's nothing to determine. This isn't actually the first part of Richter. We're trying to determine, is there a decision on the merits? And then once we get to the merits, the only reason they hypothesize in Richter is because there is no decision. You need to respond to the point that's being made that Primo is a case with a reasoned opinion, and yet the result is the same, and the Supreme Court says, no, there's ambiguity in it. You have to, in a sense, you've got to fill that gap in. So can it really be the case that the Richter ruling only applies where there's not a reasoned decision? No, I don't think it's quite that severe. I mean, the case is, if there's an ambiguity, what we know from the other Supreme Court decisions, like Yilts, like Lafler, we look at what is the actual evidence. We look at, as Judge Rendell pointed out, the party's arguments, for example, and there is no gap here. Well, let me get you to respond to something specifically from Richter. This is the court. There is no merit to the assertion that compliance with 2254D should be excused when state courts issue summary rulings because applying 2254D in those cases will encourage state courts to withhold explanations of their decisions. Isn't the argument that you're making here going to actually exacerbate that? Because what it sounds like you're saying is, if there's a reasoned decision, even if there's ambiguity, the court, you can't say anything about that. You can't step in and give any reasons for that. Am I misunderstanding your argument? I think slightly, or I'm probably not making it clear enough. Define the ambiguity. Maybe that's where the tension is here. Define what you mean by an ambiguity. I'm not suggesting that if there is a true ambiguity in a decision, that the court has to stop there and just wonder what happened. Certainly the next thing that you would do is to look at the evidence that's in front of the court. What you don't do is hypothesize what wasn't before the court. And what you don't do is what you do is look at the reasons that the court actually gave. So if you're resolving an issue... Richter says could have over and over again, and that sounds like hypothetical language, doesn't it? Could have in the situation of a summary denial. I mean, and look at... All right, so that gets to the heart, I think, of Judge Jordan's question. Are the rules different for summary denial than they are when the court says some things, but perhaps not enough or perhaps even some incorrect? Yes, absolutely. And how do we know that? How do we know the rules are different? Where do you find that? I actually think that that's the point that they were getting at in Richter with the language that you quoted. They were actually addressing the concern that... And think of what they could have said. What the court said was people are going to say that to get around this, state courts are going to stop giving explanations for the decision. And the response to that was... That's what's going to happen, Ms. Roe, though, precisely with what you're suggesting. Because if the rule you propose is the rule, that is, if you give some reason, fault can be found with that and habeas can be granted. But if you give no reason, then the federal courts have free reign to come up with things that you might have said. Then the state courts have every incentive to dummy up and just start issuing summary rulings, right? If you give an unconstitutional reason, you have to look at the reasons that the state court actually gave. And then if you... On de novo review, you can certainly review all of the reasons that could be applied to that claim. But if the state court gives a reason, what you look at is the reasons that they actually gave. And I think if you look at what happened with the court in Wessel v. Lambert, when they sent the case back, it's a perfect example. When they sent it back, they said, you didn't look at this other reasoning that the state court gave. And they put the ellipses in the right places. Let's look at the reason here, though, on the case in receipt. Okay. Where they have, in essence, a line and a half where it says, there's no evidence that the Commonwealth withheld the receipt from the defense. Yeah, and that is actually, I think, the perfect... And that is Judge Rendell's point, which is, let's look at the briefing. This is not in the context of nothing. It makes perfect sense when you look at the fact that the Commonwealth was arguing, not just initially, that this was the wrong document. Once the appellate counsel pointed out it was the wrong document, they said, well, it wasn't in our files. They had never said that the police didn't have it until after the state court briefing. They had never said. Let's assume that it's not a finding of fact, but it is a legal conclusion, or that there's sufficient ambiguity around that, that we need to do some gap filling and we're looking to the reasonable diligence exception as a basis for that. How can you simultaneously argue that this receipt was so easily available that it gives rise to an ineffective assistance claim, and at the same time that a reasonably diligent counsel could not have obtained it? Because Brady turns on the duty of the prosecutor. And Brady specifically says, these are the requirements. For a prosecutor to be held responsible for turning this over, it's got to be exculpatory impeachment evidence and it's got to be material. It doesn't turn on the prosecutor's decision of whether or not the defense counsel was effective and conducted a thorough enough investigation. Now, certainly... I'm sorry. Certainly, and the Supreme Court has never done this. In fact, I would actually say it's quite contrary to Eggers and Bagley. But certainly, some federal courts have said... have used this reasonable diligence language. And if you look at the cases, and even the cases in this circuit, what they're saying is either... And you pointed out Srusco in our first argument. In Srusco, they had the documents. They had them before trial. And if you look at other cases... Actually, in Palullo, for example, it was a warehouse of the defendant's documents, his own documents, that he had access to. So obviously, if you have it, or if it's a criminal record where everybody has the same access to the document, and you're expected to get it as a part of discovery... But that's Grant. But maybe the language in Grant describing that situation should be explained or cabined, or maybe it's dicta, because relief was granted on other grounds than Grant. It is Grant, exactly. I mean, that's exactly the case I'm talking about. And you can contrast Grant with Perdomo, for example, where they did not have... where relief was granted. And they did not have that same system set up so that the prosecutor and the defense had equal access to the document. And they put the burden rightly on the prosecutor. Wouldn't it be reasonable to construe the Pennsylvania Supreme Court's statement about there is no evidence, or to infer from it, that what the Supreme Court had in mind was, as following up on Judge Krause's question, that the Supreme Court had in mind that this evidence, i.e. the case and document receipt, was publicly available? I think if they wanted to say it was publicly available... But they didn't. And in fact, that issue was never waived. In fact, that issue appeared in the briefing in the initial appeal from conviction to the Pennsylvania Supreme Court. When you said that issue was never waived, are you talking about the Commonwealth's comment in its reply brief? I'm referring to the Commonwealth's comment in its reply brief on the direct appeal. Two responses. So we know the Supreme Court had that before, right, by virtue of the reply brief. Setting aside that you can't raise arguments for the first time in a reply. The Supreme Court can do whatever they want to with respect to waiver. Absolutely. And they had it in front of them. Absolutely. But I think what you start with is the decision itself. I think you just start with, if they wanted to say due diligence, if they wanted to say it was accessible, they would have said it. And keep in mind, this brief decision... It undermines the whole gap-filling principle, though, doesn't it? If they wanted to say, if we always use that rationale, there would be no such thing as gap-filling because there would be no reason for gap-filling. My point is, even if there were a gap, and I do not believe that there's a gap here, the next thing to do, you look at what the court actually did as at least your first step. What the court actually did, keep in mind that this was in the context of an ineffectiveness claim, so they first discuss ineffectiveness, and then as sort of almost a throwaway at the end they talk about this Brady issue. And never in the context of that did they say defense counsel could have gotten it. It wasn't publicly available, by the way. He would have had to go and subpoena it. And unlike those other cases, he had no reason to think that it existed. Actually, we have to subpoena it. Why isn't it possible, in fact it's possible, that it happened about the way I just hypothesized. One could simply take Ms. Kaysen by the hand and say, would you come along with us down to the welfare office and sign this release. And she cooperates, does so, and there it is. Absolutely. In fact, the investigator or defense counsel who didn't do his job should have done that in the first place. I absolutely agree with you, and absolutely it was counsel. Not only that, but counsel here said that his practice was to rely on the government through their discovery and his client to get his discovery. So was he ineffective and could he have absolutely easily gotten this document? I agree with you, he was absolutely ineffective. But the prosecutors did. Counsel said it was easily available. It was absolutely easily available. And the question is, was he ineffective? Yes, but does the prosecutors need This has to do with your next case, not this case. No, the question is, did the prosecutors And this all undermines the Brady argument. Go ahead, Tom. Doesn't this undermine the Brady argument? In your brief, it was interesting, beautifully written, but there's a lot of arguments of ineffectiveness in that brief. I don't think it undermines the ineffectiveness. I think you can absolutely have both, because Brady turns on the duty of the prosecutor. This is the truth-finding process, and this case is a perfect example of it. The truth-finding process includes the eyewitnesses, and your brief frequently adverts to the notion that there were nine eyewitnesses, right? There were nine eyewitnesses. Only three testified, all very favorable to the prosecution. So how can we look at that state court record such as it is and say, Well, I'm pretty confident, or maybe there's a good chance one or more of those six other witnesses who were never called by defense counsel could have given helpful testimony to Mr. Dennis. We can't do that, can we? You don't need to look at those other six witnesses to find reasonable doubt. Well, you talk about them as undermining the quality of the force, or the force of the three eyewitnesses we do have. Well, there are also ineffectiveness claims, as you know, that we brought that Judge Brody has not yet ruled on. That was my guess on this. And maybe Richter is the answer. Now, let me get back to this need-to-be-available thing. The DPW record, I assume that's a record of DPW, not of Ms. Kaysen. And you seem to be suggesting that Ms. Kaysen, or maybe with her attorney, can go to DPW and sign a release and get a record from DPW. Why are you assuming that's the case? I don't know one way or the other whether that's the case. What I do know is that it's certainly true that the Council could have subpoenaed the record. And I'm not suggesting that he wasn't effective, and I do think you can have both, because the standard for Brady does not turn on the quality of the representation of the defendant. You've said that multiple times, but if it is a not unreasonable interpretation of Brady to say that due diligence is a component of the Brady obligation, that is the due diligence of defense counsel can bear on the Brady obligation of the prosecutor, doesn't that undermine your argument? I don't believe. Two answers. I don't believe that's true, because if you look at, for example, Eggers. And what does it even mean to say there's some due diligence requirement on defense counsel? It's got to mean, doesn't it, that if something is reasonably and easily accessible to the defense, there is not a Brady obligation. Isn't that what it has to mean? The Second Circuit recently dealt with this in Lewis v. Connecticut, which is a case we submitted a letter on. Not a Supreme Court decision. No, and I'm just using it as an example of what they mean. If you look at those cases, and if you look at the cases of this circuit, what they mean by reasonable due diligence, it's an objective standard. And it's what they had, right, which is objective. And it's what they could reasonably have had. Sure, and following up on Judge Jordan's question, you can't completely extricate from the Brady inquiry, at least in some instances, the performance of or role of defense counsel, can you? I mean, as here, this is a pretty unusual situation, isn't it? This is an alibi. This is alibi evidence. Of the three Brady issues in this case, Cason is profoundly different, because the police, I think we would have to agree, it would almost have been impossible for them to know about this witness on the bus if the defendant himself had not revealed that information. Yes, absolutely. He came forward. Yes. They had no way of knowing about it. That's right. He had the sole access at that initial point to information relative to Cason. Shouldn't that impact on the inquiry? What he had access to at that time was what he knew, was his own memory. I mean, what he gave the police, he clearly didn't talk to Cason, or we wouldn't see the result that we had. He clearly didn't try to confer with her about this. We don't know that. The record doesn't show that. The record doesn't tell us. It doesn't tell us that he had sole access to Cason. I'm saying that the source of his information to the police was his recollection from that day. Isn't that the big difference here, the fact that it's the Commonwealth that calls Cason, and it's Cason Chief, and puts him at the area between 4 and 430, completely undermines him when it's his turn to testify? Yes, absolutely. And that is the issue that's in response to the Commonwealth's argument. It is not just trying to establish his alibi. It's a government witness that the Commonwealth says, well, if this receipt had come to light, we wouldn't have even called her. And this is the disinterested witness who gets up there and says, yes, all this happened, but it was two hours later. It couldn't have been then. I was at work. And so she destroys his credibility. And the jury has no reason to believe him now on anything, frankly. They have no reason to doubt the eyewitnesses or very little reason because she destroys it. So you take away that witness. That's material. It's even setting aside the fact that they could have also called her for support for his alibi. But why did he have to recant that he was on the bus? I don't understand that. What was to prevent him from saying, I was on that bus, and if she says I wasn't, she doesn't know what she's talking about. He doesn't recant that he's on the bus. What he says is I fought. Right. I mean, you can imagine, I can imagine myself in the scenario. I get up there, and the person who I clearly have not conferred with now says, yeah, I saw you, but that was two hours later. Well, I thought I saw her. I mean, to him it's clearly a surprise, and clearly his counsel has not investigated it. So I don't think it's a recantation to say that's what I thought happened. Let's call it a change instead of a recantation. Why does he have to change his testimony? I'm not sure it necessarily follows that her testimony requires him to change his testimony. No, I don't think her testimony requires him to change it. I just don't – I wouldn't characterize it as a change. I think he's thrown by the evidence. What would you call it? I think he's just trying to come up with some explanation for the fact that he thought he saw her and she's now saying she didn't see him. Would you call it an equivocation? At the same time. Would you call it an equivocation? No, because even when she gets up there and she doesn't say, I didn't see him. Right? She says, I saw him at Henry and Midvale at the bus stop. That's what her trial testimony is. So I'm at the bus stop, and we wait. If the only dispute there is the time. I saw you argue it was very harmful to his case. I thought you were arguing it. What if the litigants are not able to answer the question? Go ahead. Remember the question? I know. I got the answer to the question. I'm asking another one, which is, I thought you were arguing throughout your brief that it hurt his credibility. When he first testified, I was on the bus, I saw Kayson on the bus, and then he later said, oh, I thought I saw her on the bus. Was that not your argument in your brief? No, that's a fair way to put it. My point about that was that it hurts his credibility because this is the idea of her being a government witness. Now he's suddenly in a panic, and he's feeling like, I've got to explain. This is my story. I don't have another story. This is what happened. And she confirms everything but the time. So now he's out there saying, I thought. I mean, what else is he going to say? I mean, the only other choice is to say, she's wrong, she's a liar. Right? I mean, that's it. And I don't think they're actually very different. I have no idea why he picked one versus the other. But what he doesn't say is, now that I think about it, maybe I wasn't on the bus. He says, I thought I saw her. Right? And she actually does say that she saw him. It's just about the time. And I just want to get to one other question that Judge Shigeru said about whether Brady permits, you know, what do we look at in terms of counsel's performance? And I think it's really important to look at what happened. Brady is not the same now as it was when Brady came out. It used to require a request from defense counsel. And it no longer requires that. In Eggers, and then they made it even clearer in Bagley, defense counsel doesn't even have to ask for Brady information, let alone to go out and actually do an investigation. And that's very different from the due diligence cases where the defense counsel has it, or they can just walk in and get it, and we expect them to do so as part of the discovery. Counsel, you're not conceding, are you? Maybe you are. The ability of defense counsel to subpoena evidence makes that evidence easily available or equally available, and that reasonably diligent counsel would subpoena all the evidence out there. Wouldn't that just eviscerate Brady if that were the reasonable diligence? It absolutely would, and I'm not making that point at all. In fact, I don't think that has any bearing on it. I think that the question about whether counsel was ineffective is very different than the question of whether did he have something or did he know about something. How is it different? We're going around here, but I'm still not understanding it. Judge Krause asked a very penetrating question when she said, how can you in virtually the same breath say this man was clearly ineffective for not getting that receipt, and then say it's a Brady violation because the government should have turned it over, as if there were no reasonable diligence component to this Brady analysis or at least a reasonable diligence component that the Pennsylvania Supreme Court could perceive? How can you be holding those both at the same time and pressing on us that Brady stands independent? Two reasons. Number one, I do not believe that there is any due diligence component to Brady. But assuming for a moment... Leave that aside, because you would agree, wouldn't you, that at least there's case law out there that would support that view of it, right? What I'm saying about that case law is that if you look at those cases, they're saying what the Second Circuit said they're saying, which is the reason we can excuse a prosecutor's duty, and that is the foundation of Brady is the prosecutor's duty. We can excuse it if he either can assume the defendant had it, or they actually had it so they can't complain, because then they're not suppressing it. Or if they knew about it. For example, they gave them the facts, and that was in fact the case in Georgia, which is they had the underlying facts, and they just didn't go to that extra step to find out about it. Do you agree, do you not, that not only is there such case law out there, as Judge Jordan's question was posed, that there was such case law concerning a due diligence doctrine in 1998 at the time of the Supreme Court rule? Yes, and it was the same state that it is now. In fact, it had more resonance and vitality then perhaps than it does now. I'm not sure whether I would agree with the characterization or not, but I would agree that certainly the concept that there should be, that we should not hold a prosecutor responsible for turning over something the defense has, you can assume he has, it was absolutely something that was happening in cases then. Whether or not the Supreme Court of Pennsylvania would have, could have, or did consider it, 1998 has to be our focus in terms of any kind of due diligence jurisprudence. Sure, absolutely. And if that doctrine existed, it could have supported, been a basis of support for the Supreme Court's decision. Not under these facts in this case. No, the kinds of cases that apply that are not requiring the defendant to go out and affirmatively do investigation to unearth facts. These are facts they either had or we expect that they should have had through the regular discovery process. You can't ignore in the facts of this case that it's Dennis who gave Cason to the police. Dennis said, Cason is someone I saw. This isn't somebody that the police have dredged up. But what he doesn't have is the fact that she's going to give the police a different story at a different time. We don't know that until she gives her police statement. He does know enough to tell a police case is important. Yes, absolutely. And that's the focus of your ineffective assistance in counsel argument, which isn't before the court here today. No, and absolutely, certainly if I represented a defendant in this situation, and that was his only disinterested alibi, would I go do it? Yes. But do we excuse the prosecutor? And you asserted in your briefing before the Pennsylvania Supreme Court that the receipt was available. That he could have subpoenaed it, absolutely. Yes, but my concern is if you look at the facts here, the police took her copy. Isn't the Supreme Court entitled to accept that concession?  To accept what concession? That the receipt was publicly available. That's a different question. Answer the question being asked. Is it publicly available or that defense counsel could have subpoenaed it? Which are you saying? He could have subpoenaed it. He could have investigated and gotten it, and I would expect him to as a good attorney in a capital case. Is that the same as someone who is not getting a criminal record, right, where it's akin to discovery, where everybody has the same access to the same system? This is a case where the police went and spoke to her and took her copy. So even if he went, once he sees that she's made an inconsistent statement, even if he goes back to her at that point, she doesn't even have her copy. He has no reason to think that there's a document out there. And remember, this is an effective counsel who's relying on the government for his discovery. What was the United States? Oh, I'm sorry. Your light's up. Thank you. Thank you, Robert. I'd like to touch briefly a bit more on the William Frazier evidence because I think it is emblematic. Before you do that, I wish you'd start right where she left off. Why don't you respond to the assertion that you have no way of arguing a due diligence exception here because these aren't publicly available documents. This would have required a subpoena. This doesn't have to do with due diligence. This is the police have the record in their file, assume for the sake of discussion that that's the case. They don't turn it over. So to say, well, you could have gotten a subpoena just is outside the bounds of Brady. Why don't you answer that, please? Your Honor, I think actually that ties into where I was going, which is we don't really know on this record the answer to that question because the defendant has never established it. All the defendants have told us that it would have been hard to get the information that they would have had to issue a subpoena. That's never been the defendant's claim. Why isn't that clear as a matter of Pennsylvania law? Well, I mean, the Department of Public Welfare regulations, 55 Pennsylvania Code Section 105.1 through 5, address the privacy and confidentiality of those financial records with the Department of Public Welfare. And the only exception that appears in the statute is that upon request about a specific person, the Commonwealth may disclose the address and the amount of assistance that a person is currently receiving. That is, at the time of the request about a particular person, this receipt, even on the face of it, has far more information than that. And there's nothing that suggests that the receipt itself is a publicly available document. None of that was alleged by the defendant. None of that was in the record. There was no claim that anything, any process like that was gone through. On the contrary, what the defense claim was was that it was easily obtained. Does it have to be in the record? Could the court not take judicial notice of the Commonwealth's own law? No, Your Honor. We have no idea how they actually received the receipt. We have no idea whether it's even authentic. We can take notice that it's not publicly available. Your Honor, that's an argument which is directly contrary to the defense claim throughout this entire case. The claim has to be the claim of the government that it wasn't withheld within the meaning of Brady. Brady has three elements, exculpatory material and withheld. So isn't it up to the government to say we did not withhold this? And how do they get past that? We articulated that we didn't withhold it. We articulated that the only thing that we had as proven by the activity sheet in the exhibits at trial was the other pink document. That's why we didn't have it. How do we factor in the loss of the file, the loss of the police file in terms of determining what you had or didn't have? Your Honor, the file wasn't actually lost. What happened was that the police transferred their copies to us and they were then intermingled. There's no claim that there was some document which is missing now or that wasn't turned over. That's all that the loss comes down to. And I'd like to emphasize the defendant hasn't tried to prove any of this, and that's relevant not only to the Cason issue, where he has the burden now of showing how he did or didn't get it, all the things that we're discussing now, but as to the Frazier issue where you at least have to prove as to your real killer evidence that he really exists. I'd really like you to answer the question that was left hanging from Ms. Rowe, though. Assume for the sake of discussion that we thought we could take judicial notice of the Commonwealth's own law and that this is not a publicly available document. It would have required a subpoena of some sort. How does that affect your assertion that you don't have to worry about this being withheld because there's a due diligence thing and they failed in their due diligence? What does that do to your argument? I don't think it changes it, Your Honor, because the question is whether it was available to the defense. If the law really, and we don't really know in reality, but if there was law that would have prohibited anybody from getting that document, then it would have prohibited us from getting the document. And didn't the defense say it was available with minimal investigation? Easily obtained. What Supreme Court case supports the proposition that something is not withheld if it is somehow available to the defense? Your Honor, under EDPA, there has to be a Supreme Court case that specifically holds the opposite of that. As Judge Jordan put it previously. I'm asking you. I'm sorry. I'm curious. I don't think that the Supreme Court has directly addressed that particular issue yet, Your Honor. That's why it's not clearly established law for ethical purposes. In fact, isn't the only Supreme Court opinion on point much more limited, saying that the defense counsel doesn't have to go scavenge for information? For information that's in the prosecution's possession, Your Honor. That's the whole point here. Assuming it wasn't in the prosecution's possession. Well, if it wasn't in the prosecution's possession, then it was never withheld. I'm assuming for the sake of argument that when the state Supreme Court said that they had it, that we can take that as given. Your Honor, none of these assertions have ever been proven or even attempted to be proven by the defense. And that's really an important bottom line here. The defendant has a burden of coming forward with some evidence in order to substantiate this sort of speculation and not merely presenting affidavits which are contested. Mr. President, thank you so much. I think both counsel have taken that into account.